**UNITED STATES of America**

v.

**Michael James ARCEDIANO, Defendant.**

**Crim. No. 465–73.**

United States District Court,
D. New Jersey.

Feb. 6, 1974.

See also, D.C., 371 F.Supp. 45.

Jonathan L. Goldstein, U. S. Atty., by David R. Hinden, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Feldman & Feldman by Jon A. Feldman, Springfield, N. J., for defendant.

## OPINION

LACEY, District Judge:

█ Defendant, Michael Arcediano, indicted under 18 U.S.C. § 2 on two counts of aiding and abetting a bank robbery, 18 U.S.C. § 2113(a) and (d), moves before trial to suppress his signed confession to the Federal Bureau of Investigation on June 7, 1973, made after his execution of an F.B.I. waiver of rights form. *Cf.* Johnson v. Zerbst,

304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *and see* Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964). Defendant's motion is founded principally upon the assertion that the aforesaid confession was involuntary and hence inadmissible because it was made while under the influence of methadone, narcotics, and alcohol, either while he was "high" or in withdrawal. Additional grounds urged for suppression are that the defendant did not comprehend the F.B.I. form, and that, even if the said form was properly executed, his earlier "interrogation" by local police was conducted without appropriate *Miranda* [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] warnings, thereby tainting all which followed, including his confession to the F.B.I. *Cf.* Westover v. United States, 384 U.S. 494, 86 S.Ct. 1638, 16 L.Ed.2d 735 (1966), a companion case of *Miranda*.[1]

I find the following facts from the Jackson v. Denno hearing conducted by me on January 29 and 30, 1974, immediately prior to commencement of trial, at which police officers and F.B.I. agents testified on behalf of the United States, and the defendant, his father, and defendant's friend, James Spratt of Patrick House, a methadone maintenance center in Jersey City, New Jersey, testified on defendant's behalf. *Cf.* 18 U. S.C. § 3501.

During the late evening of June 6 or early morning of June 7, 1973, the defendant shot a man in Newark and thereafter, driving a stolen automobile, fled to the contiguous municipality of Harrison where at approximately 2:45 a. m. he was apprehended by Harrison Police Sgt. Dombrowski and his partner. They had encountered the defendant as he stopped at an intersection, their attention being drawn to him by shouts

---

1. As the Supreme Court said in Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964):

 [I]t is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, Rogers v. Richmond, 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760], and even though there is ample evidence aside from the confession to support the conviction. [citations omitted]

from the driver of another automobile that the defendant had just shot someone. They had advanced upon defendant's automobile, with guns drawn, and before any extensive conversation of any moment occurred, and prior to defendant's making any incriminating statements, orally gave him his *Miranda* warnings. They placed him under arrest, had him get out of the car, and searched him. He had no weapon on his person; however, the officers found a pistol on the passenger side of the front seat next to where defendant had been sitting. They then handcuffed him and took him in a police car to Police Headquarters. It is noted that after the defendant had been given his warnings at the arrest scene, and without any interrogation by the arresting officers, the defendant volunteered that he was driving a stolen car and had shot a man who he hoped was dead. He also stated he was on methadone and had just been released from Atlanta Penitentiary.

At Police Headquarters the defendant went before Lieutenant Villanova, who was on desk duty, and was booked; and was then taken into another room and "processed" by Sgt. Dombrowski and his partner, who obtained certain personal data from the defendant, such as his full name, address, etc. No investigative interrogation concerning the defendant's criminal activity occurred at this time. The two officers and the defendant had arrived at the police station at 3:00 a. m. Upon completion of processing about 3:05 or 3:10 a. m., the defendant was lodged in a cell.

Of emphatic significance on movant's claim of involuntariness are the following findings: From the moment that he was apprehended, until he was placed in a cell about 3:10 a. m., the defendant responded promptly to all of the commands given him by the arresting officers. His comprehension of the officers' directions and questions was well within normal limits. He walked steadily and his speech was neither rambling nor incoherent. He gave off no odor of alcohol. His demeanor was normal; and at no time did Sgt. Dombrowski observe him with his head down or depressed. The officers did observe that he had a badly bruised left eye, an injury he had received in a fight with the man whom he had shot. He did not complain of pain or illness, and did not request methadone, narcotics, or medication. Although he had volunteered to the arresting officers that he had shot someone and was driving a stolen automobile, he said absolutely nothing to them concerning the crime with which he is charged in this proceeding. While there was some suggestion that police officers from another municipality were also present in the processing room, cross examination of Sgt. Dombrowski failed to develop this into finite fact; and I must therefore conclude that, as has hereinabove set forth, no substantive interrogation of the defendant took place in the time interval 3:00–3:10 a. m.[2]

Turning for a moment to the testimony of the defendant, as it related to the period from 2:45–3:10 a. m., it was in numerous particulars irreconcilable with that of Sgt. Dombrowski. Unfortunately, defendant's testimony was riddled with self-contradictions. He endeavored, as to questions directed at certain specifics of this early morning encounter, to avoid a response by claiming he "was flying" or "high," by reason of narcotics or alcohol or a combination thereof, and thus lacked recollection. Yet, in his unguarded moments as a witness, when he seemingly felt it served his interests, he professed a meticulous recollection of even minute detail. This pattern of behavior as a witness also marked his testimony regarding events after 3:10 p. m. I observed him closely as he testified. Regretfully, I find I must reject substantial portions of his testimony, as is hereinafter set forth, as unworthy of belief.

---

2. Indeed, there was no interrogation indicated as necessary at that point. Little remained by way of police activity other than for the Newark police to come to get defendant and charge him in Newark for the shooting.

Lt. Charles Villanova followed Sgt. Dombrowski as a witness for the United States. He confirmed that the defendant had been brought into the station house shortly after 2:45. He had no conversation with the defendant until after 3:15 a. m. Thus, at a time after 3:15 a. m., and still prior to any police interrogation, the defendant, from his cell, called to a policeman in charge of the cell block that he wanted to see the officer in charge; and Lt. Villanova responded. The defendant told him he wished to speak to an F.B.I. agent. Lt. Villanova said he required justification for calling the F.B.I.; and the defendant stated that, if he had to do time, he would rather do federal than state time. Lt. Villanova repeated that he needed justification for calling the F.B.I. The defendant then told Villanova that he wanted to give the F.B.I. information regarding a bank holdup in North Bergen.[3]

At this point Lt. Villanova gave defendant his *Miranda* rights. Defendant said nothing more at this point except to continue to press for the F.B.I. to be brought to his cell; and Lt. Villanova told the defendant he would try to arrange it.

Lt. Villanova, however, decided he would first call the North Bergen police to verify whether there had been a bank robbery in that municipality. In response to this call two detectives from North Bergen came to the Harrison station house at about 6:00 a. m. and were taken to the defendant's cell by Lt. Villanova. They had a photograph with them of someone who, it was alleged, had been involved in a North Bergen bank holdup. They compared it with the defendant and stated that he was not the one in the photograph. When the defendant realized that they were from North Bergen he remained silent and would say nothing. This brief confrontation lasted but a few minutes, nothing of any consequence took place or was said. The defendant was asked if he knew the man in the photograph, but he refused to respond.[4]

After the departure of the North Bergen police, Lt. Villanova was told by the defendant that "those fellows" were "off base" and that "they turn me off." Lt. Villanova then told the defendant that if he, the defendant, wanted F.B.I. agents brought in so he could admit to them his participation in the bank holdup, he, Villanova, would call them. The defendant then stated that the picture he had been shown by the North Bergen officers was not of him; while the robbery was being committed, he had stayed in the car and wore a female wig.[5] During this entire period of time, as Lt. Villano-

---

3. The defendant obviously was most eager to have the F.B.I. brought in. Indeed, he asked Lt. Villanova several times whether he had called that agency. It is clear that, at the time of the very first such request, the defendant had determined he was going to confess the charged bank robbery to the F. B.I., thus putting himself into federal custody for bank robbery as an accomplice at a time when he could not know whether the man he had shot was going to survive.

4. The defendant conceded in his testimony that he had asked for the F.B.I. more than once, that the North Bergen police had said they were F.B.I. agents, that he could tell they were not, and thus he refused to talk to them. Yet, when asked what time the North Bergen police came, he responded by stating that he did not know because he was "flying." It was such self-contradictions as these which helped to destroy defendant's credibility. His reasons for wanting to be in

federal rather than state custody are referred to, *infra*, in detail in Special Agent Keogh's testimony.

5. As I have hereinabove indicated, I find that Lt. Villanova, like Sgt. Dombrowski, had given defendant his *Miranda* warnings; and I reject defendant's denial of such. Also, that defendant knew he had a right to remain silent is clear. He demonstrated this in his refusal to talk to the North Bergen police. Moreover, as he himself stated at trial, he knew his rights. Thus, I find not only, as stated, that he was given his *Miranda* warnings by the officers but that he understood them. Illuminating too is the fact that even when he confessed to the F.B.I., as hereinafter described, he withheld certain facts. Also, the defendant told the F.B.I. agents he had been arrested by agents on at least three prior occasions, and had signed waiver forms at least twice before. Interestingly, after an earlier flat denial, asked again

va and the defendant conversed, the latter was quite composed, answered questions responsively, and engaged in normal conversation. He asked questions that were "sensible" and he did not ramble in his speech. His ability to withstand interrogation was demonstrated by his rebuff of the North Bergen police. His perception was exhibited by his awareness that they were police officers, not F.B.I. agents. His logical analysis of his predicament is readily apparent: the way to federal custody, and out of state hands, was achieved by withholding information from the North Bergen police and presenting it to the F.B.I. I thus must reject the notion that the defendant at this time was not in full control of all his faculties. I also find unacceptable the claim that he "was flying."

In the course of his experience, Lt. Villanova has seen a full range of symptoms of people under the influence of narcotics. They "ramble or drift off" in their speech, their speech is slurred, they are not composed, and they stagger. He observed none of these manifestations in the defendant.

Lt. Villanova placed a call to the F.B.I. and went off duty at 7:30 a. m. During his tour of duty he did not discuss with the defendant the shooting in Newark or the stolen car, or any activities other than the bank holdup.

Next to testify for the United States was Special Agent Francis Keogh of the F.B.I. He and two other agents arrived at the Harrison police station at 10:30 a. m. on June 7, 1973 in response to a

call from someone there. They met a Captain Saporito who brought the defendant into a room in the station at about 10:35 a. m.

Mr. Keogh and the other agents identified themselves to the defendant as special agents of the F.B.I., who responded that he had talked to agents before in other matters. Indeed, he mentioned the name of the agent he had spoken to on one such occasion, a name Mr. Keogh recognized.[6]

The defendant told Mr. Keogh that he had had some difficulty the evening before, was faced with resultant local charges; and now preferred that he be held in federal rather than state custody. He offered information about a bank robbery, but conditioned this offer upon his getting an F.B.I. guarantee that he would be placed in federal custody. He had, he said, been in both federal and state custody previously and preferred federal custody because the jails were better. Moreover, in view of the fight and the shooting he had been in, if he went to a State prison facility, his victim might have friends there who would take reprisal against him.[7]

Mr. Keogh refused to make any promise or give the demanded guarantee; but said that he would speak to local authorities and would do his best to have the defendant placed in federal custody. This is of course what later happened.

This initial phase of the F.B.I. interview took approximately 25–30 minutes with no further discussion of any bank robbery than has been indicated. I accept Mr. Keogh's testimony that the de-

---

whether Lt. Villanova advised him of his rights, he stated that he had been locked up so many times and he had been through "this" so many times, that he did not really remember what had occurred this time.

6. It is this kind of fact, demonstrative of an unimpaired memory and a functioning being, that is of course illuminating to the factfinder in a hearing such as this.

7. The defendant testified during the hearing that he preferred federal custody because state authorities would make him go "cold turkey" whereas federal confinement would

enable him to obtain methadone. He was asked if he had expressed this reason for his preference to the agents. He avoided giving a direct answer, but maintained that "they knew" and "they said they would try to help me." I explicitly reject the inference defendant would have me draw, that the agents knew he was in need of narcotics and, in effect, promised him they would make it possible for him to get drugs—or methadone—if he confessed. I find instead that he did not exhibit any need for drugs or treatment at this time and that the agents did not promise him such.

.fendant was calm, lucid, friendly and co-operative. His answers were direct and concrete, he understood his plight, and the questions that he put to Mr. Keogh demonstrated lucidity and comprehension as well as rational thought processes. I find that he was well oriented in time and place, had nicely and precisely calculated what he wanted to achieve and how to achieve it, and in all respects was acting of his own free and well controlled will and disposition.

About 11:00 a. m. the defendant told Mr. Keogh that, since the agents had said they would try to have him placed in federal custody, he was satisfied and would now tell them about the bank robbery. I find that he received nothing more than this assurance, that he was neither threatened nor coerced, and that he continued to act voluntarily, knowledgeably, and intelligently.

The conversation continued calm and quiet. There was no shouting or threatening. The atmosphere was a "calm and friendly" one. The defendant's manner and demeanor remained unchanged.[8]

Before the agents would allow him to inform them about the bank robbery, and at 11:01 a. m., Mr. Keogh presented to the defendant a waiver of rights form which was read to the defendant and which he read and then signed.[9] The reading concluded at 11:05 a. m., at which time the defendant affixed his signature. During the course of the interview the defendant was definite and specific in details that he gave.[10] Some of the information that was provided was known by the agents before that time and some had not been known. The defendant, at the conclusion of the statement, told the agents that he had felt that the government would not be able to prove his participation since he had read in the newspapers that it was believed a woman had been driving the car whereas it was he, wearing a female wig.

Mr. Keogh himself wrote the statement, starting at 11:35 a. m. and concluding at 11:58 a. m.; and then, showed it to the defendant. Also, even as he wrote it, he would stop to review and verify with the defendant details earlier narrated by him to the agents.

 Mr. Keogh told the defendant to read the statement and, if it was accurate, to initial the first page and thereafter add a paragraph indicating that he had read and understood it and that it was true and correct at the end. As the exhibit reflects, this was done. I reject as unworthy of belief the defendant's testimony that he simply did what the agents directed, without reading the statement. He now confirms its accuracy at this hearing, except for one minor detail. I find he had to be thinking clearly, and with a normal intellectual capacity at the time he confessed, to recall and to supply the abundant detail

---

8. The defendant testified that he was in withdrawal during the interview, that he was sick and in pain, and manifested these symptoms to the agents. The total import of Mr. Keogh's testimony is to the contrary. I accept Mr. Keogh's testimony and reject the defendant's. The fact is that the defendant had planned and calculated on how to get the F.B.I. to come to interview him. He would hardly have acted now so as to discourage them from interviewing him. Aside from analytical factors, based upon my earlier expressed observation of defendant as he testified, I find him wanting in credibility.

9. The content of the form is now well known. See United States v. Dutkiewicz, 431 F.2d 969, n. 1 (3d Cir. 1970) ; see Ex. G–1. The defendant does not urge that it lacked in content that which *Miranda* requires (nor did he with respect to the earlier warnings given by the police officers). I find that the defendant read the waiver of rights form, understood it, and signed it. Again, it is noted that, while he testified he "never" reads such materials, but simply signs them, I find that on the basis of his demeanor his testimony in this regard is unworthy of belief. Moreover, considered overall, it is clear that he knew exactly what it was the agents had presented to him and he had signed.

10. At the hearing the defendant reviewed the confession in all its detail, and conceded he gave all of such detail to the agents. Again, this is enlightening on his emotional. physical and intellectual status at the time he confessed.

embodied in the confession.[11] During the course of the interview the defendant orally identified his "friend," as mentioned in the statement, as Mauchlin, a codefendant in this case. The defendant said he had obtained a gun which he gave to Mauchlin. At the hearing, testifying while Mauchlin sat in the courtroom nearby, the defendant denied he had implicated Mauchlin.

The defendant was taken from the room and back to his cell at about 12:10 p. m. after signing the statement.

At no time did the defendant ask for an attorney or request that the interview be stopped. I find that he knew and had been repeatedly advised of his right to an attorney and that this right, like his Fifth Amendment right, was voluntarily, knowingly, and intelligently waived by him.[12]

The next and last witness called by the United States was Dr. Ralph Brancale. He has been a forensic psychiatrist for many years and has been in the field of psychiatry for 40 years. He is Director of Menlo Park diagnostic center and has outstanding credentials. He conducted two psychiatric examinations of the defendant, one on January 18 and another on January 28, 1974. He was called by the United States to render an opinion as to defendant's status on June 7, 1973, when he confessed, an opinion founded upon hypotheses inclusive of his own examinations and diagnosis and the testimony of the witnesses for the United States as heard by Dr. Brancale while he sat in the court room.

I have decided not to place the testimony of Dr. Brancale into the scales of this hearing. Essentially, there is no necessity for any psychiatric testimony on the issue placed before me. The key to voluntariness is to be found in the facts as I determine them to be. The testimony of the officers and agents, which I find credible and accept, leads to only one conclusion, that the defendant was rational, clear, lucid, in possession of his faculties, and able to make cognitive judgments and decisions. Strikingly demonstrative of this is his own analysis of his position as he sat in the Harrison station and his implementation of his decision that he would achieve for himself federal custody. Accordingly, I expressly disregard the testimony given by Dr. Brancale.[13]

Mr. James Spratt was defendant's first witness. He is associated with Patrick House, a methadone maintenance center in Jersey City. He first met the defendant in January 1972 when the defendant was a drug addict. On June 6, 1973 the defendant came to the clinic between 5 and 5:30 p. m. It appeared that he had "detoxified" at his own request 3 or 4 days before, had left the clinic, and now sought readmission because he could not bear being on the street. They talked for a half to three-quarters of an hour and it was agreed that the defendant would be readmitted. However, he could only be given a small dosage (20 mgm.) of methadone at that time (6–6:30 p. m.) and would have to return the next night (June 7) to see a physician. Defendant's right eye was very badly blackened and protruded beyond his nose. He looked drawn, pale, tired and withdrawn. He said that he was "sick," had been drinking and "shooting" drugs, and that he was sorry he had left the clinic.

---

11. The Supreme Court in Jackson v. Denno, *supra*, leaves no doubt that on a hearing such as this the *reliability* of the confession is not to be resolved, but only the question of voluntariness. I thus make no finding as to reliability. The confession is referred to for the light it casts upon defendant's condition when it was made.

12. During the hearing he stated he knew he had a right to an attorney, and that he had had the services of appointed counsel on at least one prior occasion. This is no callow youth. His appearance, bearing, and manner demonstrate a shrewd and sophisticated man, hardened by exposure to and apprehension by law enforcement. What he lacks in formal education is more than compensated for by his experience.

13. It is on the basis of similar reasoning that I denied defendant's request that an "independent" psychiatrist be appointed to examine him on the voluntariness issue.

Mr. Spratt was advised early the next afternoon (June 7) that the defendant was in the Harrison Police Department asking that he be medicated. Mr. Spratt took a small quantity of methadone to the Harrison jail where, at about 6:00 p. m., he administered it to the defendant who was quiet, withdrawn, and depressed. The defendant told Mr. Spratt that he had "shot a guy" in Newark and two officers present said that the man was in "severe" condition.

Mr. Spratt described all of the symptoms of withdrawal. Withdrawal from methadone can be worse than heroin withdrawal. He indicated in general terms that there would have been a withdrawal at the time of the F.B.I. interview, that is, 11:00 a. m. on June 7, manifested by sniffles, running nose, sweating, general weakness, pains in the elbows, knees and joints, running eyes, stomach cramps and vomiting. Yet, as I have found, none of these symptoms were observed by the government's witnesses, and thus I must conclude, accepting their testimony as I do, that the defendant was not in withdrawal before 12:00 noon on June 7.

Mr. Spratt then stated that on the other hand if the defendant was "high" he would be in a state of euphoria. Yet, neither was this condition observed by the government witnesses, as I credit and understand their testimony. If he was somewhere between "high" and "withdrawal," his condition would have been comparable to anyone not under the influence of narcotics and methadone.[14]

Mr. Spratt was an honest and credible witness. However, his testimony is subject to the limitations imposed by his non-medical background and the many uncertainties introduced by imponderables about which he had no knowledge and could make no worthwhile assumptions. Finally, as I have repeatedly emphasized, the officers and agents actually 'saw the defendant in the morning of June 7; and I accept their testimony about his condition at the times they observed it.[15]

Also on the defendant's case, his father testified that he visited his son in jail in the evening of June 7 at about 7:30 p. m. Defendant had cut himself with some glass from a light bulb he had broken. Apparently the inference urged is that he had attempted suicide; however, no medical treatment was necessary. In any event, this occurred subsequent to the administration of methadone by Mr. Spratt.

The defendant then testified in his own behalf. He reiterated what Mr. Spratt had stated as to his Patrick House treatment and stated he had been in jail 13 of the last 15 years prior to June of 1973. He is now 30 years of age.

He denied he was given his *Miranda* warnings by anyone other than the F.B.I. Yet, in further testimony, he endeavored to create the impression he could recall little of what had gone on because he was "high." As I have said, I find he was advised of his rights, both by Sgt. Dombrowski and Lt. Villanova. The defendant, if believed, would have been virtually unconscious, and detached from reality, from all the drinking he testified he had done after getting methadone at 6:00 p. m. on June 6. Indeed, he even claimed to have "shot" cocaine during the evening of June 6–7. Yet he had driven an automobile from Newark to Harrison without incident, so far as we know, and the testimony is clear that he did not give off an odor of alcohol or indicate any unsteadiness when taken

---

14. If, of course, his condition was normal in this sense, then it can hardly be urged that his waiver of rights was involuntary as to the product of an overborne will. *See* United States v. Dutkiewicz, 431 F.2d 969, 970 (3d Cir. 1970). As hereinafter discussed, there in no *per se* rule of involuntariness as to confessions made after ingestion of drugs. Rather the test is whether one's will was overborne.

15. It follows, of course, that I do not discount Mr. Spratt's testimony concerning defendant's condition as it was at 6:00 p. m. on June 7, many hours after the events of the morning.

from the car. No one, of course, other than the defendant himself, knows what he drank or "shot" after taking the methadone; however, I must refer to the credible testimony of the government witnesses as to defendant's condition in the morning of June 7 as they observed it. Other portions of defendant's testimony are hereinabove referred to as clarity mandates. *See,* for example, notes 2–11 and 12–14, and accompanying text.

■ On the basis of the foregoing findings, judged in the light of applicable legal principles, I hold that the defendant voluntarily, knowledgeably and intelligently waived his constitutional rights with a full understanding of the *Miranda* statements I find were made to him on two occasions by the Harrison officers, and, later, by the F.B.I., and that his confession to the F.B.I. was voluntarily, knowledgeably and intelligently made, while the defendant was in full possession of his faculties, and was not the product of an overborne will.

### The Law

■ For a defendant's confession to be voluntary, and thus admissible, the government must prove by a preponderance of the evidence that his will was not overborne and that the confession was the product of a rational intellect. *See* Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); United States v. Silva, 418 F.2d 328 (2d Cir. 1969); Gladden v. Unsworth, 396 F.2d 373 (9th Cir. 1968); 18 U.S.C. § 3501. In resolving the issue of voluntariness, a court must consider the "totality of circumstances." Boulder v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969). Some relevant factors include "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence

of threat or inducement." Brown v. United States, 356 F.2d 230, 232 (10th Cir. 1966).

### *Defendant's Claim That His Waiver of Rights and Confession Were Drug Induced*

■■ Even when it is charged that a confession was given under the influence of narcotics or during a withdrawal period, the central question of voluntariness *vel non* remains the same. There is no *per se* rule mandating that confessions made under such circumstances are inadmissible. Wade v. Yeager, 245 F. Supp. 62, 65 (D.N.J.1964); Ortiz v. United States, 318 F.2d 450, 453 (9th Cir. 1963), cert. denied, 376 U.S. 953, 84 S.Ct. 971, 11 L.Ed.2d 972 (1964); Comment, Admissibility of Confessions and Denials Made Under the Influence of Drugs, 52 Nw.U.L.Rev. 666 (1957); Note, Some Problems Relating To the Admissibility of Drug Influenced Confessions, 24 Brooklyn L.Rev. 96 (1957); Annot., 69 A.L.R.2d 384 (1960). As stated by the Court of Appeals in this Circuit in United States v. Dutkiewicz, 431 F.2d 969, 970 (3d Cir. 1970), where the defendant had claimed to be under the influence of narcotics at the time of his confession:

> "The question in each case is whether the [appellant's] will was overborne at the time he confessed" Lynumn v. State of Illinois, 372 U.S. 528 at 534, 83 S.Ct. 917 at 920, 9 L.Ed.2d 922 (1963).

Thus, the trial court must scrutinize all of the pertinent facts attending the confession with particular focus upon a confessing defendant's demeanor, coherence, articulateness, his capacity to make full use of his faculties, his memory, and his overall intelligence.

The Supreme Court in Culombe v. Connecticut, 367 U.S. 568, 601–602, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961), stated:

> . . . No single litmus-paper test for constitutionally impermissible interrogation has been evolved . . . [t]he ultimate test remains . . .

the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, *if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.* Rogers v. Richmond, 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760]. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession. [emphasis supplied]

■ Was the defendant's "capacity for self-determination critically impaired"? The fundamental decision he made to escape from state custody into federal confinement negatives any such impairment. Even when frustrated initially by Lt. Villanova's calling in the North Bergen police, the defendant remained fixed in his ultimate objective. He would relate nothing to these officers, although the bank robbery was in their community. He refused to identify the man whose photograph they had. He continued to importune Villanova to bring the F.B.I. to him. His reasons for so doing are hereinabove set forth. His capacity for self-determination was unimpaired, and, indeed, it continued to function even as he dealt with the F.B.I. and insisted upon imposing conditions to his conveyance of information. His shrewd scheming to free himself from serious state charges hardly are reflective of an overborne will.

Of critical importance too is that he had not been victimized by extensive interrogation before making his decision to confess to the F.B.I. Brought to the police station at 3 a. m., and placed in a cell at 3:10 a. m., I find that no questioning of him of any kind took place thereafter up to that time when he sent the message which brought Lt. Villanova to him. It was his own idea, brought on not by intensive interrogation; until the moment he mentioned a bank robbery to Lt. Villanova he was under no suspicion whatever so far as that crime was concerned. It is true he was in custody, but not for bank robbery. No investigation of that crime had focused on him. It was he who projected himself into that particular spotlight, clearly an act of "self-determination" when his motives are analyzed as has been done herein.

As for the other factors to be considered, as has been thoroughly covered in the Court's findings of fact, the defendant's demeanor, coherence, memory, comprehension, and perception all militate against his claim of involuntariness.

Accordingly, as I have already found, defendant's confession is not rendered involuntary because of the alleged impact of drugs. Ortiz v. United States, supra, 318 F.2d at 453; United States ex rel. Sadler v. Commonwealth of Pa., 306 F.Supp. 102 (E.D.Pa.1969), aff'd., 434 F.2d 997 (3d Cir. 1970); United States v. Welsh, 417 F.2d 361 (5th Cir. 1969); Shinko v. United States, 408 F. 2d 361 (9th Cir. 1969).

*Was There A Violation of the Six-Hour Requirement of 18 U.S.C. § 3501(c)?*

■ 18 U.S.C. § 3501(c) provides: In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or detention: *Provided,* That the time limitation contained in this subsection shall not ap-

ply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

Although not referred to by the defendant, the Court nonetheless has considered this question and determined that, under the circumstances attending the confession, it is not rendered inadmissible though the defendant was arrested at 2:45 a.m. and confessed at 11:30 a. m., prior to being taken before a magistrate.[16] To paraphrase, § 3501(c) prohibits ruling a confession inadmissible solely because of delay in bringing a suspect before a magistrate if the confession was made within six hours of arrest plus such additional period as is found to be reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate. To determine whether these limits have been exceeded, the period to be calculated is the time "while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency . . . ." To be resolved, then, is whether Congress intended that both State and Federal custody be included in this calculation. It seems clear that only Federal custody is to be considered pertinent in the absence of a "working relationship" between State authorities and Federal officers. United States v. Fennell, 429 F.2d 843 (8th Cir. 1970); United States v. Davis, 459 F.2d 167 (10th Cir. 1972). I find in the instant matter that there was no "working relationship" between the Harrison police authorities and agents of the Federal Bureau of Investigation, see Anderson v. United States, 318 U.S. 350, 63 S. Ct. 599, 87 L.Ed. 829 (1943), particular-

ly in view of the fact that it was the request by the defendant Arcediano, for a conference with agents of the F.B.I. which initiated the contact between the Harrison police authorities and the Federal officers.

Even assuming, however, that both state and federal custody must be considered, the fact that there was a delay in excess of the limits set out in § 3501(c) does not necessarily require suppression of a confession obtained during that delay. Such a delay is only one factor among the several stated in § 3501(b) to be considered in determining whether the confession was voluntary and therefore admissible.

Section 3501(b) provides:

The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

In United States v. Halbert, 436 F.2d 1226, 1232 (9th Cir. 1970), the court

---

16. It is noted, of course, that the arrest and confinement were by municipal authority, not federal, and that, in a sense, defendant

was being held for F.B.I. interview at his own request.

made an exhaustive analysis of the statute in question and refused to draw from it any six-hour exclusionary provision. It said:

> Subsection 3501(c) explicitly provides that confessions shall not be inadmissible solely because of delay in arraignment if they are voluntary and either made within six hours of arrest or made during a delay in arraignment that is reasonable considering transportation problems in getting the defendant before the magistrate. Thus, on its face subsection 3501(c) provides only that *some confessions shall be admitted. It does not explicitly provide that all other confessions shall not* be admissible.
>
> [emphasis in original] See also, United States v. Marrerro, 450 F.2d 373 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972).

I find therefore that the defendant's confession was not involuntary because of delay in arraignment.

### Was the Confession Wrongfully Induced By A Promise

■ Though not explicitly raised by defendant, he does by implication suggest that he would not have confessed if the F.B.I. agents had not promised him they would do their best to get him into federal custody. It is true that it has been said that any promise, "however slight," which induces a confession renders it involuntary and hence inadmissible. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).[17] This is, however, hardly the rule today. Thus, in United States v. Ferrara, 377 F.2d 16, 17 (2d Cir. 1967), cert. denied, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967), the Court of Appeals stated:

> . . . The *Bram* opinion cites with approval the statement in an English textbook that a confession is not voluntary if "obtained by any direct or implied promises, however slight".

That language has never been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." [citations omitted]

The "wooden" application of *Bram* was also rejected in United States v. Frazier, 434 F.2d 994 (5th Cir. 1970). In *Frazier*, an F.B.I. agent told defendant "that if he cooperated with them his cooperation would be made known to the United States Attorney, that there might be some consideration given by the United States Attorney but that the agents could make no promises." The court held such a promise, standing alone, insufficient to render the confession involuntary. I am in agreement with the holdings of *Ferrara* and *Frazier* and thus find that the defendant's confession was not rendered involuntary by any promises made to him. Indeed, the instant facts make this an *a fortiori* case, since it was the defendant who offered information, conditioning it upon being assured the agents would endeavor to get him placed in federal custody.

### The Westover Rule Is Inapplicable

■ Defendant on oral argument suggested that the confession was barred under the doctrine of Westover v. United States, 384 U.S. 494, 86 S.Ct. 1638, 16 L.Ed.2d 735 (1966), decided with *Miranda*, because of alleged incessant interrogation from his arrest until he confessed to the F.B.I.

*Westover* obviously is to be distinguished. While the record is unclear as to whether local authorities other than the Harrison police interrogated the defendant from 7:30 to 11:00 a. m. on June 7, 1973, there is no doubt that de-

---

17. On the general subject of confessions induced by promises, *see* Orfield, Confessions of Federal Criminal Defendants, 16 U.Fla.L. Rev. 219, 224 (1963).

fendant was not interrogated by any local police after he was placed in a cell at 3:10 a. m. and until, having decided he was going to confess to the F.B.I., he asked Lt. Villanova to bring the F.B.I. to him. Subsequently, at 6:00 a. m. the North Bergen police came; but it can hardly be said that their presence eroded defendant's will so that he was softened into confessing to the F.B.I. He refused to talk to the North Bergen police because they were not the F.B.I.

This aspect of the defendant's argument therefore borders upon the frivolous and cannot be seriously entertained.

Accordingly, the motion to suppress defendant's confession is denied.