**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin J. REYNOLDS,
Defendant-Appellant.**

**No. 75–1794.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1976.
Decided April 5, 1976.

George R. Ripplinger, Jr., Belleville, Ill., for defendant-appellant.

Henry A. Schwarz, U. S. Atty., Robert L. Simpkins, Asst. U. S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before PELL and SPRECHER, Circuit Judges, and PERRY, Senior District Judge.*

PERRY, Senior District Judge.

Defendant-appellant Calvin J. Reynolds (hereinafter "Reynolds") appeals from a five-year sentence of imprisonment imposed upon him for violation of 18 U.S.C. § 876.[1] Reynolds was indicted on April 15, 1975 upon the following charge:

That on or about the 22nd day of March, 1975, at Lancaster, Illinois, in the Eastern District of Illinois, CALVIN J. REYNOLDS knowingly and with intent to extort from Mrs. Kenneth E. Kavanaugh a sum of money, did deposit in an authorized depository for mail matter, to be sent and delivered by the Postal Service, a written communication, dated March 21, 1975, addressed to Mrs. Kenneth E. Kavanaugh at Lincoln Drive in Lawrenceville, Illinois, and containing a threat to injure the person of Kenneth E. Kavanaugh, that is, that four individuals had hired someone to kill Kenneth E. Kavanaugh; all in violation of Title 18, United States Code, Section 876.

*Facts*

The undisputed facts are as follows:

(1) On the morning of March 22, 1975, Shirley K. Kavanaugh received in the mail a letter reproduced as follows:

---

\* Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

1. 18 U.S.C. § 876 provides in pertinent part:

\* \* \* \* \* \*

Whoever, with intent to extort from any person any money or other thing of value, so deposits, or causes to be delivered, as aforesaid [in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service according to the direction thereon], any communication containing any threat . . . to injure the person of the addressee or of another, shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

3/31/93
BCK

MARCH 21

THERE IS A CONTRACT OUT TO KILL KENNETH

I HAVE THE FOUR NAMES OF THE MEN

THAY HAVE HIRED A HIT MAN

I WANT $10,000 FOR NAMES WILL MAIL

YOU THE NAMES. TAKE MONEY TO MAN ON

LAWRENCE RICHLAND COUNTY LINE ROAD

SOUTH OF 50 AT FOUR WAY STOP HOUSE ON SW

CORNER

HIRE HIM TO TAKE MONEY AND GO TO

DENNARD ARKANSAS WILL CONTACT

HIM ON WAY PAY HIM $1,000 AND

HE IS TO BE THERE BY THE 26 OF MAR.

After receiving the letter, Shirley Kavanaugh telephoned her husband, Kenneth E. Kavanaugh. He came home, read the letter, took it back to his plant and called the local chief of police, Donald Foster.

(2) Chief Foster and the county sheriff, Elbert Bailey, drove to Mr. Kavanaugh's plant, were given the letter by Mr. Kavanaugh, and thereupon called in the Federal Bureau of Investigation [hereinafter "FBI"]. The letter was turned over to FBI Special Agent Robert L. King on his arrival on March 24, 1975, whereupon Sheriff Bailey and Special Agent King went to the residence mentioned in the letter.

(3) Upon their arrival at the residence, they determined that Reynolds lived there but that he was at a neighbor's house. They encountered Reynolds at the neighbor's house. Special Agent King advised Reynolds of his rights and questioned him

regarding the letter. Reynolds at that time denied any knowledge of the letter. Reynolds gave Special Agent King a handwriting exemplar reproduced as follows:

MARCH 21
THARE IS A CONTRANT OUT TO KILL KENNETH

I HAVE FOUR MANES OF THE MEN

(4) Reynolds was interrogated again on March 26, 1975 by Special Agent King, who first read an Interrogation and Advice of Rights form to Reynolds. Reynolds then signed the form.[2]

(5) Reynolds made a confession which was incorporated in a nine-page statement prepared by Special Agent King and signed by Reynolds. The statement was witnessed by Special Agent King, Sheriff Bailey, and Rosemary Kirby, Reynolds' common-law wife.

(6) At arraignment on May 1, 1975, Reynolds pleaded not guilty. Subsequently a jury trial was set for June 9, 1975. When his case was called for trial, Reynolds executed a Waiver of Jury and was given a one-day trial.

(7) At the close of the testimony regarding Reynolds' signed statement, counsel for the defense moved to suppress the statement upon the grounds that

. . . the statement was made only as a result of promises made by Agent King to the defendant in this case that if he cooperated that the possible penalty would be lighter and that the possibility of a recognizance bond would be greatly enhanced, and Mr. Reynolds' own testimony that he would not have confessed had those promises not been made.

The court denied the motion to suppress, stating:

. . . The Court specifically finds that Government Exhibit 6, being the confession by this defendant, was voluntarily and understandingly made after Mr. Reynolds had been advised of his Constitutional rights, and had voluntarily

and understandingly signed the Advice of Rights as had been previously printed. The court then received Reynolds' confession into evidence.

(8) After resting his case, Reynolds' counsel moved for a judgment of acquittal. After hearing arguments on the motion and after reading the cases cited by opposing counsel, the court denied the motion and found Reynolds guilty as charged.

(9) On August 21, 1975 the court imposed sentence on Reynolds. On August 25, 1975, Reynolds filed a notice of appeal in which he appealed "from the five year sentence imposed in this action on the 21st day of August, 1975."

*Findings of the Court*

The District Court made the following findings:

The Court finds—I should first say that the confession, which was received in evidence, the Court finds was voluntarily and understandingly made without any duress, fraud, threats or similar acts and, therefore is validly and conclusively a part of this record.

The Court finds that the letter was written to the Kavanaughs, that the Kavanaughs received the letter, that it was placed in the United States mail for delivery to the addressee, that it was delivered to the addressee, that it was an extortion letter, that the defendant was advised on two different occasions as to his rights under the law and under the Constitution, that he signed the two written Waiver of Rights, and in the confession he stated that he understood them when he signed them, and that he volun-

2. The form as signed by Reynolds is reproduced in Appendix A.

tarily and understandingly signed the letter and again that the confession was voluntary and understandingly signed, that the letter was knowingly written and that it was written for the purpose of injury and that it contained a threat.

We don't need to use the word "threat." The contents of any written piece, whether it be a letter, a missile, or whatever it is, it is the contents that determine the meaning and when you read this letter, which is Government's Exhibit 2, the import of that letter and the context and content of that letter has to determine the meaning and there· is only one meaning. It is a violation of that provision of the statute.

Therefore, the Court finds the defendant, Calvin J. Reynolds, guilty in manner and form as charged in the indictment and it is the judgment of this Court that the defendant, Calvin J. Reynolds, is guilty of the crime charged in the indictment in manner and in form as charged therein.

### The Issues

Both parties have formulated the issues thuswise:

1. Do the facts of this case as elicited at defendant's trial constitute a violation of Title 18, U.S.Code, § 876?
2. Did the trial judge err in refusing to suppress and in admitting into evidence the confession of the defendant?

### Do the Facts Constitute a Violation of 18 U.S.C. § 876?

 Reynolds first contends that the facts of this case do not show a violation of the statute in that the letter he mailed to Mrs. Kavanaugh does not contain any threat to injure the person of the addressee. (Mrs. Kavanaugh) or of another. Thus, argues Reynolds, an essential element of the offense charged is lacking. Reynolds relies upon Petschl v. United States, 369 F.2d 769, 770 (8th Cir. 1966), for the proposition that there are two essential elements to prove a violation of 18 U.S.C. § 876, viz., (1) that the defendant wrote a letter addressed to a

certain person containing a threat to injure the person of the addressee or of another, and (2) that the defendant knowingly caused the letter to be forwarded by United States mail. We agree that Petschl correctly sets out the essential elements of the offense with which Reynolds was charged, but we cannot go so far as to agree that Reynolds' letter contains no threat of injury. To the contrary, we think that the letter is an extortion demand by mail which is coupled with language carrying the reasonable connotation of a threat to injure Mr. Kavanaugh, and that the letter lies therefore within the scope of the proscription of the statute, as this court held in United States v. Prochaska, 222 F.2d 1, 2 (7th Cir. 1955), cert. denied, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955).

Reynolds' counsel on appeal is the same counsel who defended Reynolds during his trial. There, in support of his motion for a judgment of acquittal, he advanced the same contention that he advances here,—i. e., that Reynolds' letter contained no threat by the writer thereof to injure anyone; in addition, he contended that the letter was merely a request for money,—that the letter "merely set a price on information." We think that the letter did more than "set a price on information." In his letter, Reynolds stated in effect that four persons had hired someone to kill Mrs. Kavanaugh's husband and that if Mrs. Kavanaugh did not deliver $10,000, Reynolds would not tell her the names of the four persons. Therefore the inference is unmistakable that Mr. Kavanaugh would be killed if the money was not delivered.

The clear intent of the writer of the letter was to induce fear of the worst kind of injury,—death. That the letter induced fear is obvious. After Mr. Kavanaugh returned home and read the letter, he immediately notified the local chief of police, who in turn notified the county sheriff. The sheriff testified that he and the chief of police thereupon went to Mr. Kavanaugh's place of business and that Mr. Kavanaugh was "extremely nervous". What the court said in United States v. Barcley,

452 F.2d 930 (8th Cir. 1971), is pertinent here. In *Barcley* the defendant was charged with communicating threats by mail in violation of 18 U.S.C. § 876; however, neither the addressee of the letter nor another lawyer criticized therein testified that he experienced fear upon reading the letter. Said the court:

> In prosecutions for extortion, proof of the effect of an allegedly threatening communication upon the victim may be crucial. [citations omitted] *Similarly, in a case of this kind, it seems that proof of the effect of an allegedly threatening letter upon the addressee would throw light upon the intent of the sender* . . [Emphasis added.] 452 F.2d at 934.

■ Reynolds strongly contends, however, that he himself did not threaten to injure anyone. He contends, in effect, that 18 U.S.C. § 876 cannot be violated unless the writer of the communication threatens that he himself will injure the addressee of the communication or any other person. We do not read the statute so narrowly. We believe that the statute is violated if the communication contains a threat of injury and is sent through the United States Postal Service.

In view of the foregoing, we conclude that the facts as elicited in the instant case clearly constitute a violation of 18 U.S.C. § 876.

### Should Reynolds' Confession Have Been Suppressed?

Reynolds next contends that without his confession his conviction could not have been obtained, and that his confession should have been suppressed because it was not voluntarily given. Of course, the District Judge specifically found that the confession was both "voluntarily" and "understandingly" made. Was this finding of fact by the trial court clearly erroneous? If not, we must sustain the finding. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S. Code; *West v. Schwarz*, 182 F.2d 721, 722 (7th Cir. 1950), *cert. denied*, 340 U.S. 830, 71 S.Ct. 67, 95 L.Ed. 609 (1950); *McDermott v. John Baumgarth Company*, 286 F.2d 864, 868 (7th Cir. 1961) and cases cited therein; *see also, United States v. Ogle*, 418 F.2d 238, 239 (5th Cir. 1969), and *United States v. Maxwell*, 484 F.2d 1350, 1351–1352 (5th Cir. 1973).

Reynolds testified on cross-examination that he voluntarily signed his name to the confession, that the confession was read aloud to him before he signed it, and that he was given an opportunity to change anything in the statement which he didn't believe was true.

Reynolds contends, however, that the confession was made only as the result of promises made by Special Agent King that if Reynolds cooperated, the sentence may be lighter and there may be a possibility of a recognizance bond pending trial. Reynolds further contends that he testified that if he had not received these promises from Special Agent King, he did not think that he would have made a confession. Reynolds relies heavily upon *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), as authority for the proposition that a confession, in order to be admissible, must not be obtained by any direct or implied promises, however slight, the true test of admissibility being that the confession is made freely, voluntarily and without compulsion or inducement of any sort. Reynolds argues that his confession was the result of just such a promise or improper inducement and, under the *Bram* rule, was not voluntary. Therefore, maintains Reynolds, it was reversible error for the trial court to admit it into evidence and thus violate Reynolds' Fifth Amendment rights against self-incrimination.

Reynolds was twice interrogated before he signed the confession. Prior to the first interrogation, Reynolds signed the Interrogation and Advice of Rights form after having been told of his rights. Prior to the second interrogation, and prior to his being told of his rights again, Reynolds requested from Special Agent King information regarding his bond and the possible maximum penalty for the offense with which he was charged if he was convicted. Pertinent ex-

tracts from Special Agent King's testimony are set out below.

Q. What conversation did you have with Mr. Reynolds prior to reading him his rights, anything?

A. No, sir.

Q. You walked up to the door, he opened the door and you said, "You have the right to remain silent." You started off that way?

A. No, sir. I explained to him again what charges was involved. He asked me what the maximum sentence was if he was convicted and I explained to him.

Q. What did you tell him?

A. Twenty years.

Q. Did he ask you anything about possible bond?

A. Yes, sir. He did.

Q. What did you tell him?

A. I told him that would be up to the United States Attorney's office and the judge.

Q. Did you make any speculation as to what usually happens in these kinds of cases?

A. I told him there was probably a possibility that if he cooperates and if he was involved, that it would be more lenient on him.

Q. The bond or the penalty or both?

A. Both.

Q. This was before he told you anything?

A. Yes, sir.

Q. Now, to get the chronology right, was this before or after you read him his rights?

A. I had read his rights prior to this.

Q. The day before?

A. Right.

Q. I mean on this particular day—

A. Yes, sir.

Q. Was this before or after you read his rights when you talked about penalties and everything?

A. I will have to refer to the statement again.

Q. Would you like to do that?

Mr. Ripplinger: May I approach the witness?

The Court: Yes.

Q. (By Mr. Ripplinger) Okay. Now, the question and answer thing about the penalties bond and everything, now that you have refreshed your recollection, do you recall whether or not that occurred before or after you read him his rights on the second day?

A. Before.

The Court: You mean you told him about his rights prior to the time he signed Government's Exhibit 6?

The Witness: Yes, sir. I did.

Q. (By Mr. Ripplinger) And also, I believe your testimony, just to clear it up, is that his rights were read after the discussion about possible penalties and the possibility of release?

A. Right.

Q. I take it then that after that and after the warning of his rights that Mr. Reynolds said he would cooperate with you?

A. He asked Mrs. Kirby, who sat in during the interview, if he should tell us of his involvement, at which time she stated that she was tired of running from the law in Minnesota.

■ We have read the record carefully and we believe that an examination thereof will indicate that Special Agent King did not in fact make any promise to Reynolds; that his statement to Reynolds as to leniency was couched in the terms of "possibility", —which is not in our view an obscure word; and that the statement was not volunteered by Special Agent King but, on the contrary, was made only in response to an inquiry initiated by Reynolds concerning the maximum sentence for the offense and the bond upon which he could be released.

The Government contends that *United States v. Arcediano*, 371 F.Supp. 457 (D.N.J. 1974), and two cases cited therein,—*United*

*States v. Ferrara*, 377 F.2d 16 (2nd Cir. 1967), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967), and *United States v. Frazier*, 434 F.2d 994 (5th Cir. 1970),—are dispositive of the instant case. True, these cases support the Government's position, but we think that the instant case is even a stronger case for the Government than is *Arcediano*. In that case, the defendant Arcediano was indicted under 18 U.S.C. § 2 on two counts of aiding and abetting a bank robbery. Before trial he moved to suppress a signed confession which he had made to FBI special agents after he had executed an FBI waiver of rights form.

Arcediano had shot a man in Newark, N.J. and, after attempting to flee in a stolen car, was apprehended and arrested by officers of the Harrison, N.J., police department, who brought him to the Harrison police station. Prior to any interrogation, Arcediano said that he wanted to speak to an FBI agent; that, if he had to do time, he would rather do federal time than state time.

FBI Special Agent Keogh and two other FBI special agents arrived at the police station and identified themselves to Arcediano as special agents of the FBI. Arcediano told Special Agent Keogh that he had had some difficulty the evening before, was faced with resultant local charges, and now preferred to be held in federal rather than state custody. He offered information about a bank robbery, but conditioned this offer upon his getting an FBI guarantee that he would be placed in federal custody. He had been, he said, in both federal and state custody previously and preferred federal custody because the jails were better; moreover, he added, in view of the fight and the shooting he had been in, if he went to a state prison facility, his victim might have friends there who would take reprisal against him.

Special Agent Keogh refused to make any promise or to give the demanded guarantee, but said that he would speak to local authorities and would do his best to have

the defendant placed in federal custody. This later happened.

Arcediano told Special Agent Keogh that, since the FBI agents had said that they would try to have him placed in federal custody, he was satisfied and would now tell them about the bank robbery. Before the FBI special agents would allow Arcediano to inform them about the bank robbery, Special Agent Keogh presented to Arcediano a waiver of rights form which was read to Arcediano and which Arcediano read and signed. Arcediano then was interviewed and at the conclusion of the interview signed a statement of confession which had been prepared by Special Agent Keogh over the course of some 23 minutes. The District Court found that Arcediano's confession to the FBI special agents was "voluntarily, knowledgeably and intelligently made, while the defendant was in full possession of his faculties, and was not the product of an overborne will."

Arcediano contended that he would not have confessed if the FBI special agents had not promised him they would do their best to get him into federal custody. The District Court rejected this contention, saying:

> . . . It is true that it has been said that any promise, "however slight," which induces a confession renders it involuntary and hence inadmissible. *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). [footnote omitted] This is, however, hardly the rule today. Thus, in *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir. 1967), cert. denied, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967), the Court of Appeals stated:
>
> > . . . The *Bram* opinion cites with approval the statement in an English textbook that a confession is not voluntary if "obtained by any direct or implied promises, however slight". That language has never been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examina-

tion of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." [citations omitted]

The "wooden" application of *Bram* was also rejected in *United States v. Frazier,* 434 F.2d 994 (5th Cir. 1970). In *Frazier,* an F.B.I. agent told defendant "that if he cooperated with them his cooperation would be made known to the United States Attorney, that there might be some consideration given by the United States Attorney but that the agents could make no promises." The court held such a promise, standing alone, insufficient to render the confession involuntary. I am in agreement with the holdings of *Ferrara* and *Frazier* and thus find that the defendant's confession was not rendered involuntary by any promises made to him. Indeed, the instant facts make this an *a fortiori* case, since it was the defendant who offered information, conditioning it upon being assured the agents would endeavor to get him placed in federal custody. 371 F.Supp. at 469.

In *United States v. Ferrara, supra,* the defendant Ferrara was convicted of having violated and having conspired to violate the federal narcotics laws. At his trial the Government introduced portions of a statement taken from Ferrara after his arrest, in which statement he confessed his participation in the sale of narcotics. The trial judge conducted a *voir dire* hearing out of the presence of the jury. On the *voir dire* a federal agent testified that he had told Ferrara "if he cooperated with the United States [Attorney] I felt sure he would get out on reduced bail". The trial judge concluded that Ferrara's statement was admissible. On appeal, Ferrara contended that this ruling was error, inasmuch as the agent had made a promise which rendered Ferrara's confession involuntary as a matter of law. The Court of Appeals rejected Fer-

rara's contention and his reliance on *Bram v. United States, supra,* and concluded:

There can be no doubt in the present case that defendant's statement was voluntary. Before the interview began the Assistant United States Attorney informed Ferrara . . . of all his rights, . . . *We hold that the agent's comment was not the kind of inducement or promise that would, by itself, make the confession involuntary.* [Emphasis added.] 377 F.2d at 18.

In accord with *Frazier* and *Ferrara* is *United States v. Glasgow,* 451 F.2d 557, 558 (9th Cir. 1971), where the court held that the following remarks by the interrogating officer were not such a representation as would, standing alone, render the defendant's confession involuntary:

While I was talking to [Glasgow], I told him that he was in a position to help himself . . . by continuing on with this delivery . . . ; I didn't give him any guarantee of anything other than [that] the matter would be made known to the court and to the United States Attorney handling the case.

*I told him that in cases similar to his in the past, that men have cooperated and have received a break, so to speak.* [Emphasis added.] 451 F.2d at 558 n. 2.

*Frazier* has also been cited with approval by other Courts of Appeals,[3] including this court in *United States v. Springer,* 460 F.2d 1344, 1347 (7th Cir. 1972), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972), where we held that the defendant's oral confession was not involuntary by reason of the fact that FBI agents told him that if he were to cooperate, though no promises could be made, the United States Attorney and the District Judge would know of the fact that he had cooperated.

We agree with the Government that before finding that a confession is voluntary, a court must consider the totality of circumstances, *Boulden v. Holman,* 394 U.S.

---

3. *United States v. Glasgow, supra; United States v. Cluchette,* 465 F.2d 749, 754 (9th Cir. 1972).

478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), and then decide that the Government has proved by a preponderance of the evidence that the defendant's will was not overborne and that his confession was the product of a rational intellect. *See Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). We believe that the Government has met its burden here.

For all of the foregoing reasons, the judgment of the District Court and the sentence of defendant Reynolds are each Affirmed.

## APPENDIX A

FD-395 (Rev. 10-10-67)

### INTERROGATION; ADVICE OF RIGHTS

#### YOUR RIGHTS

Place _Laurence, Ill_
Date _3/26/75_
Time _10:40 AM_

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

#### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _C J Reynolds_

Witness: _Robert L. Key, SA, FBI, Springfield, Illinois 3/26/75_
Witness: _Elliot Bailey Sheriff of Laurence County 3/26/75_
Time: _10:55 AM_

terminated: 2:10 PM