STATE

v.

**Manuel J. PACHECO and William F. Webster.**

No. 83–254–C.A.

Supreme Court of Rhode Island.

Aug. 30, 1984.

Dennis J. Roberts II, Atty. Gen., Margaret R. Levy, Sp. Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Providence, Mark L. Smith, Woonsocket, for defendants.

## OPINION

WEISBERGER, Justice.

These cases come before us on appeal by two defendants, Manuel "Joe" Pacheco (Pacheco) and William Webster (Webster), from their convictions of murder and manslaughter respectively. Following a joint-jury trial in the Superior Court, a judgment of conviction for murder in the first degree was entered against Pacheco. On July 1, 1982, he was sentenced to life imprisonment as mandated by G.L.1956 (1981 Reenactment) § 11–23–2. Webster was found guilty of manslaughter, for which the trial justice sentenced him on August 16, 1982, to a term of twenty years, with fifteen years to serve, five years suspended, and five years' probation. Both defendants filed separate notices of appeal in this

court, and their appeals were consolidated for our review. We affirm the judgment of conviction in respect to Pacheco but order a new trial in respect to Webster.

On Sunday, April 12, 1981, the body of Frederick Michael Mills (Mills) was found in a wooded area in Tiverton, Rhode Island. The victim was pronounced dead on the scene by the deputy state medical examiner, who testified at trial that an autopsy revealed death to have been the result of both multiple stab wounds inflicted by a knife and loss of blood. The medical examiner also testified that the victim's "superficial" neck artery had been severed and that he had suffered stab wounds in the heart. His autopsy report stated that the victim's male organ had been slashed and that a tattoo had been removed from the body. Police officers who responded to the scene reported that the arms of the victim were in a position that suggested crucifixion.

On April 13, 1981, Gwendolyn Ferry, with whom Mills had been living for about two weeks, responded to the Tiverton police department and advised the police that she had last seen Mills at her home on Saturday morning, April 11, 1981 at about 2 a.m. She reported that he had stayed briefly and then left, telling her that he was going out with "Joe." Ferry told the police that as Mills left, she saw him get into a car that was later determined to be Pacheco's.

On April 15, 1981, a co-worker of Elizabeth Gibbons (Gibbons), Pacheco's female companion, reported to the Tiverton police department and gave the following account to police officers. The co-worker stated that while at work on Monday, April 13, 1981, she had asked Gibbons about an injury on her face which appeared to be tooth marks. Gibbons reported that the injury had been inflicted by Pacheco. In an effort to comfort Gibbons, her co-worker told her, "Cheer up; the guy they found in Tiverton could be Joe," whereupon Gibbons began to cry and stated that "Joe killed the guy in Tiverton."

Gibbons later testified that on Friday, April 10, 1981, Pacheco and she had met Mills. Mills allegedly expressed an interest in Gibbons, and Pacheco was not pleased. Pacheco later that evening invited Mills to his apartment, whereupon Pacheco, outside Mills's hearing, told Gibbons that he was "going to slit the _____'s throat." Pacheco, Webster, and another companion, Arthur Hecox, persuaded Mills that they were all going out in what might be euphemistically called the pursuit of female company. The four men departed. Gibbons further testified that when Pacheco returned, he had blood on him, and he told her that he had killed Mills and that Webster had held a knife to Mills's neck as they preliminarily required Mills to remove the jacket he was wearing. Pacheco and Webster were subsequently indicted on April 28, 1981, for murder in the first degree in regard to the death of Frederick Michael Mills.[1]

I

## WEBSTER

We shall initially address four of Webster's grounds for appeal. First, Webster claims that the trial justice committed reversible error in ruling that a statement made by Pacheco in Webster's presence was admissible against Webster as an adoptive admission. Second, he claims that the trial justice erred in admitting Webster's statement to a police officer on the night of his arrest. Third, he claims that the trial justice erred in denying his motion for judgment of acquittal. Fourth, he claims that the trial justice committed error in refusing to sever his trial from that of Pacheco. Additional facts will be supplied as needed in the discussion of these issues.

---

1. Hecox and Gibbons were also charged in the indictment. However, the charge against Hecox was reduced from murder to harboring. Gibbons was charged with harboring, but the charge was dismissed.

## A. THE ADOPTIVE ADMISSION

█ Webster learned through pretrial discovery that the state intended to introduce into evidence as an adoptive admission a statement made by Pacheco in Webster's presence. Thereupon, Webster filed a pretrial motion in limine to exclude all references to the statement during the trial. After conducting a hearing, the trial justice denied the motion and ruled that the statement was admissible against Webster as an adoptive admission in accordance with *State v. Lerner*, 112 R.I. 62, 83–84, 308 A.2d 324, 338–39 (1973). We agree with his ruling.

█ At the outset, we set forth the standard of review in ruling on the question before us. The issue of whether a statement is admissible as an adoptive admission depends upon the resolution of mixed questions of law and fact. With respect to a trial justice's findings of fact on motions to suppress, we have consistently held that they will be given great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or that the trial justice overlooked or misconceived relevant evidence on a crucial issue. *State v. Jenison*, R.I., 442 A.2d 866, 872 (1982); *State v. Cline*, 122 R.I. 297, 303, 405 A.2d 1192, 1196 (1979); *State v. Leavitt*, 103 R.I. 273, 289–90, 237 A.2d 309, 318–19, *cert. denied*, 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968). We have also held that absent extraordinary circumstances, as in situations in which only one factual conclusion is possible and thus only a question of law is presented, the conclusions of a trial justice in mixed questions of law and fact are entitled to the same weight as are his factual findings. *Fournier v. Fournier*, 479 A.2d 708, 715 (R.I.1984); *see DeNardo v. Fairmount Foundries Cranston, Inc.*, 121 R.I. 440, 449, 399 A.2d 1229, 1234 (1979).

At the preliminary hearing, the defense presented a witness, Richard Cobb, who testified that Pacheco and Webster came to his apartment shortly after the murder. Cobb further testified that Pacheco told him that he had just killed Mills and that "Webster held a knife while he made him [Mills] take off a leather coat." Cobb stated that Webster was within about three or four feet of Pacheco and Cobb when Pacheco made the statement. He stated that Webster never spoke but was smiling and nodding in affirmation. His testimony indicated that although he, Cobb, had consumed some alcohol several hours before seeing Pacheco and Webster, he had slept during the interim. He also stated that it appeared to him that Webster was "kind of on and off the board, the verge of being sober and drunk." Webster's testimony totally contradicted the account given by Cobb.

█ When an incriminatory or accusatory statement is made during a conversation that took place in the presence and hearing of a criminal defendant, and such statement is not denied by the defendant under circumstances in which repudiation of an untrue statement would be expected, both the statement and the fact of his silence are admissible against the defendant as an indication that the statement is true and the defendant has adopted it as his own. *State v. Lerner*, 112 R.I. at 83–84, 308 A.2d at 338; *State v. Reitsma*, 68 R.I. 310, 316, 27 A.2d 312, 315 (1942). This exception to the general rule that hearsay evidence is inadmissible does not of course apply under circumstances in which the defendant is in police custody and exercises his or her right to remain silent. *State v. Marcello*, 72 R.I. 382, 384–85, 51 A.2d 828, 829 (1947); *State v. Epstein*, 25 R.I. 131, 136–37, 55 A. 204, 206–07 (1903). In *Lerner, supra*, this court has stated that in ruling on the admissibility of such statements, a trial justice should consider five factors:

"(1) [whether] the statement was incriminating or accusatory;

"(2) that it was one to which an innocent person in the situation of the defendant would reply;

"(3) that it was made within the presence and hearing of the defendant;

"(4) that he understood the meaning of the statement; and

"(5) that he had an opportunity to deny or reply to the statement." *State v. Lerner*, 112 R.I. at 84, 308 A.2d at 338.

Webster argues that Pacheco's statement to Cobb did not meet the standards enunciated in *State v. Lerner*, and therefore was not admissible as an adoptive admission against him. He contends that because he was highly intoxicated, he was unable to understand and respond to Pacheco's statement.

■ We have examined the record and conclude that there is ample evidence to support the factual findings of the trial justice; he was not clearly wrong, nor did he misconceive or overlook the relevant evidence before him. In determining the facts about whether Webster heard Pacheco's statement, whether he was capable of understanding it, and whether he had an opportunity to respond, the trial justice assessed the credibility of Cobb and of Webster. The trial justice observed that Cobb's testimony was "not only clear and convincing * * * [but] much more reliable than the contradictory testimony of Mr. Webster." We believe that the trial justice considered all of the relevant factors before him and assessed the credibility of both witnesses as he is required to do. Assessment of credibility is within the province of the trial justice. *State v. Jenison*, 442 A.2d at 873. We therefore hold that the trial justice was correct in determining that Pacheco's statement to Cobb was admissible as an adoptive admission against Webster.

## B. ADMISSIBILITY OF WEBSTER'S STATEMENT TO POLICE OFFICERS

Webster filed a pretrial motion to suppress statements that he had made at the police station the night of his arrest. The trial justice denied the motion. Webster asserts that after the arresting officers had given him the *Miranda* warnings, he exercised his right to remain silent, and therefore subsequent statements elicited by the officers were inadmissible. The testimony provided the following facts.

When Webster was arrested at his apartment in Fall River, Massachusetts, the arresting officer, Sergeant Robert Peladeau of the Fall River police department, read him the *Miranda* warnings. The officer testified that thereafter Webster signed a waiver-of-rights form that substantially stated that he fully understood all that was contained in the form, that he had read it, and that it was explained to him without threats or promises. The form stated, "I, voluntarily, knowingly and intelligently waive all of my constitutional rights and agree to answer all questions inquired of me by the police." The Fall River police sergeant went on to say that Webster told him he had nothing to say at that time. Apparently, the officer interpreted this utterance to mean that Webster did not know anything concerning the event about which he was being interrogated. Webster was then transported to the Fall River police station. Approximately an hour and a quarter later, a Rhode Island State Police officer told Webster that he was working in conjunction with the Fall River police in connection with a murder committed in Tiverton, Rhode Island, renewed the *Miranda* warnings, and informed Webster that he was being charged with the murder. Webster again stated that he understood his rights and that he was willing to waive them. In response to the officer's questions, Webster stated that he knew Mills, that he, Pacheco, and another man had been with Mills at a cafe hours before the murder, and that the three men agreed that Mills "needed a few slaps." Webster related that they then took Mills for a ride, slapped him around, and threw him out of the car. When the officer asked if Webster would be willing to make a written statement and take a polygraph test, he stated that he wanted to speak with an attorney. No further questioning took place.

■ Webster contends that his statement to the Fall River police sergeant that

he had nothing to say at that time was tantamount to invoking his right to remain silent. This contention is directly counter to the finding of fact made by the trial justice.

> "The Court finds, on facts before the Court that there is no evidence before the Court that this Defendant invoked his right to remain silent, nor is there any evidence before the Court that [Lieutenant] Cunningham, who was investigating a murder which took place in the State of Rhode Island, was aware of any investigation which took place between the Fall River police at the time of the serving of the warrant."

This finding of fact by the trial justice is entitled to great deference on appeal and is not to be disturbed unless it is clearly erroneous. *State v. Riendeau*, R.I., 448 A.2d 735, 737 (1982); *State v. Amado*, R.I., 424 A.2d 1057, 1063 (1981); *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *State v. Leavitt*, 103 R.I. 273, 290, 237 A.2d 309, 318–19 (1968).

■ An independent examination of the record indicates that the findings of fact by the trial justice were amply supported by the evidence. The signing of the waiver-of-rights form presented by the Fall River sergeant indicates a willingness to answer any questions that might be posed by the police. The testimony of the State Police officer, Lieutenant Charles Cunningham, also indicates that after fresh *Miranda* warnings, Webster answered his questions without any reluctance whatsoever. Indeed, it appears that Webster considered his statement regarding the "slapping around" of the victim to be exculpatory, and therefore he was quite willing to give such a statement to Cunningham.

The facts of this case differ greatly from those of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in which a suspect invoked the right to counsel but the next morning was told by an officer in charge of the detention cell in which he was placed that "he had to talk" to two detectives concerning the same charges about which he had been interrogated the previous night. *Id.* at 479, 101 S.Ct. at 1882, 68 L.Ed.2d at 382–83. The Court held that when the right to counsel has been invoked, no further interrogation could take place "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. In the case at bar there was no invocation of the right to counsel by Webster, nor was there an invocation of the right to remain silent by him when officers arrested him at his apartment. The substance of the testimony on direct examination and cross-examination of the Fall River police sergeant indicates no more than that Webster had nothing to tell at that juncture.

The state cites *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), for the proposition that a suspect who has been given his *Miranda* warnings and who states that he does not want to answer any questions regarding the crime about which he is being interrogated may at a later time after fresh warnings be interrogated by other officers about a separate crime. *Id.* at 103–05, 96 S.Ct. at 326–27, 46 L.Ed.2d at 321–22. On the facts of this case, an application of the *Michigan v. Mosley* doctrine is unnecessary and inapposite. At no time prior to giving his statement did Webster indicate any refusal or reluctance to answer questions. For these reasons, the trial justice did not err in admitting into evidence Webster's statement given to Lieutenant Cunningham.

## C. JUDGMENT OF ACQUITTAL

■ Webster next asks us to review the trial justice's denial of his motion for judgment of acquittal. He claims on appeal that there was insufficient evidence of guilt to warrant submission of his case to the jury. We cannot agree and, in fact, conclude that the record before us was replete with evidence more than sufficient to withstand such a motion.

The trial justice scrupulously set forth all the evidence upon which his denial of Webster's motion was based. Specifically, he referred to various statements that placed Webster with Pacheco and Mills on the night and during the time of the murder—the adoptive admission that we find was properly in evidence; statements of Gibbons; Webster's statement that he was with Pacheco and Mills that evening and his statement that Mills "needed a little slapping"; as well as statements made by Pacheco when he took the stand at trial. The adoptive admission in particular provided information which indicated that Webster had been at the scene of the murder and had held a knife to the victim's neck, thus aiding and abetting in the homicide.

 When called upon to rule on a motion for judgment of acquittal, a trial justice must consider only that evidence that the prosecution contends is capable of generating proof of guilt beyond a reasonable doubt. The trial justice must view that evidence in the light most favorable to the prosecution, drawing all reasonable inferences consistent with guilt, and without passing on the credibility of witnesses or weighing the evidence. *State v. Romano*, R.I., 456 A.2d 746, 756–57 (1983); *State v. Ahmadjian*, R.I., 438 A.2d 1070, 1084 (1981). In reviewing the trial justice's ruling, our duty is the same.

We conclude that the evidence, when viewed most favorably to the state and when all reasonable favorable inferences are drawn therefrom, could lead a rational trier of fact to find Webster's guilt beyond a reasonable doubt. Therefore, Webster's challenge to the trial justice's ruling is rejected.

## D. SEVERANCE

Prior to and several times throughout the trial Webster moved to sever his trial from that of his codefendant pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure. Rule 14 speaks in imperative terms regarding the obligation of the prosecution and the court in the event that the confession of one defendant implicates a codefendant:

"If two (2) or more defendants are to be tried together and the State intends to introduce at trial a statement or confession of any of the defendants, the attorney for the State shall, prior to trial, on notice to all defendants deliver to the court any such written statement or confession * * * for in camera inspection and determination of whether any portion of the statement or confession involves another defendant and, if so, whether such portion can be effectively deleted therefrom. If the court determines that effective deletions cannot practicably be made, it shall order separate trials of the defendants."

In the case at bar, a taped confession by Pacheco, which had been transcribed into approximately eighteen pages of typewritten material, was introduced into evidence over Webster's objection. Pacheco's confession clearly implicated Webster by stating that on the night of the homicide Webster held a knife to the neck or head of the victim while Pacheco caused the victim to remove a coat that the victim was wearing. Pacheco then went on to describe the fashion in which he inflicted multiple stab wounds on the victim's body. The trial justice denied Webster's motion to sever his trial from that of Pacheco. He also denied a motion to excise reference to Webster in Pacheco's confession prior to admission at trial.

Upon completion of the playing of the tape before the jurors, Webster moved to strike that portion of the confession which implicated him and further requested the court to instruct the jurors that they were to disregard any statements in Pacheco's confession which implicated Webster in the crime. This motion was also denied.

Webster argues on appeal that the refusal to sever under these circumstances violated the provisions of Rule 14 and also violated the right to confrontation as enun-

ciated in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case two defendants, Bruton and Evans, were convicted, after a joint trial, of armed postal robbery. Evans had made an extrajudicial statement to a postal inspector in which he confessed to the crime but also stated that Bruton had been a joint participant as well. The trial justice instructed the jury that the confession was competent evidence against Evans but was inadmissible hearsay in regard to Bruton and therefore could not be considered by the jurors in determining Bruton's guilt. Neither Evans nor Bruton testified in the case, and as a result Evans was not subject to cross-examination. *Id.* at 124–25, 88 S.Ct. at 1621–22, 20 L.Ed.2d at 478–79. The Supreme Court of the United States reversed the conviction with the following rationale:

> "We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] * * * guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479.

Subsequently in *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), the Court to some extent diluted the effect of the *Bruton* principle by holding that in a situation in which a codefendant took the stand and was subject to cross-examination (and in fact testified favorably to the defendant), there was no violation of the right to confrontation in admitting the codefendant's confession implicating O'Neil with appropriate limiting instructions. *Id.* at 629–30, 91 S.Ct. at 1727, 29 L.Ed.2d at 228.

Most recently, in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), a plurality of the Court held that it was not a violation of the *Bruton* principle to admit interlocking confessions of defendants who were tried jointly. The trial judge had given cautionary instructions to the jury that each confession could only be used against the defendant who made it and could not be considered as evidence pointing to the guilt of other codefendants. *Id.* at 67, 99 S.Ct. at 2136, 60 L.Ed.2d at 719. The plurality upheld the convictions stating that

> "admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution." *Id.* at 75, 99 S.Ct. at 2140, 60 L.Ed.2d at 724–25.[2]

At the time that Rule 14 was adopted, the drafting committee was aware of *Nelson v. O'Neil, supra.* Indeed, the reporter's notes to the rule recognized that the thrust of *Bruton* had been "somewhat blunted" by that decision. The reporter went on to suggest, however, that "the complete ban on [the use of] any portions of a confession which incriminates a co-defendant is deemed fair as well as easy to administer." Super.R.Crim.P. 14, RPTR's Notes.

Thus, it is apparent from the reading of the plain language of the rule that the Superior Court of Rhode Island did not wish to follow the somewhat tortuous course that the Supreme Court had taken in applying and withholding the effect of the *Bruton* principle. It desired to adopt and did adopt a bright-line rule that required either the deletion of portions of a confession that implicated a codefendant, or the granting of separate trials. Therefore, it is unnecessary to determine whether *Parker v. Randolph, Nelson v. O'Neil,* or *Bruton,* all *supra,* is controlling in the instant case. The plain language of Rule 14 was conclusive upon the trial justice and is conclusive upon this court.

 When Webster moved for a separate trial, relying upon Rule 14, the

---

**2.** Four out of eight members of the Court subscribed to this restatement of the *Bruton* principle. Justice Blackmun concurred in the result. Justice Powell did not participate.

trial justice had two choices. He could require the deletion of that portion of any statement given by Pacheco which implicated Webster, or he could have granted Webster a separate trial. His refusal to do either was a violation of the plain and unambiguous terms of the rule. Rules duly adopted by the Superior Court and approved by this court (as occurred in respect to this rule) have the force and effect of a statute and supersede any statutory regulations with which they conflict. General Laws 1956 (1969 Reenactment) § 8–6–2, as amended by P.L.1975, ch. 222, § 1. Consequently, as in statutory construction, if a court rule is free of ambiguity and expresses a clear and definite meaning, there is no room for interpretation or extension, and the court must give to the words of the rule their plain and obvious meaning. *See Narragansett Food Services, Inc. v. Rhode Island Department of Labor*, R.I., 420 A.2d 805, 808 (1980); *Citizens for Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53, 57 (1980); *North Providence School Committee v. Rhode Island State Labor Relations Board*, 122 R.I. 415, 418, 408 A.2d 928, 929 (1979); *State v. Angell*, 122 R.I. 160, 170, 405 A.2d 10, 15 (1979).

█ In the case at bar, the words of Rule 14 are plain and unambiguous. If the prosecution offers a confession by one defendant, and if this confession includes a statement that casts an accusation of guilt upon a codefendant, such codefendant is entitled to one of two types of relief. Either the court must delete that portion of the confession which refers to the objecting codefendant, or the court must grant the codefendant a separate trial. Although the rule was adopted in order to avoid *Bruton* problems, it is not subject to variations depending upon the shifting majorities or pluralities that may prevail from time to time in the Supreme Court of the United States or other segments of the federal judiciary. By adopting this rule, the Superior Court converted this constitutional issue with all of its vagaries and complexities

into a simple matter of state law designed to protect the fairness of procedures relating to the joint or separate trials of persons accused of crime. Having adopted this rule, justices of the Superior Court and this court are bound thereby.

█ Since the trial justice did not grant to Webster either of the types of relief expressed by Rule 14, his supplemental instruction to the jury (after first refusing a requested instruction to the same effect) that it could not consider Pacheco's confessions or admissions as against Webster did not constitute an adequate substitute for the relief mandated by the rule. Consequently, Webster is entitled to a new trial at which he will not be confronted by the incriminating extra-judicial statements of Pacheco.

II

PACHECO

We shall address the following claims raised on appeal by defendant Pacheco. First, he contends that the affidavits upon which warrants for the search of his apartment and his car were issued were executed improperly and did not furnish sufficient probable cause. Second, he claims that his warrantless arrest was illegal, thereby rendering a subsequent taped confession while he was in police custody also illegal. Third, he asserts that his taped confession was not voluntarily given by virtue of promises made to him by detectives while he was under arrest.

A. PROBABLE CAUSE FOR SEARCH WARRANTS

Pacheco challenges both the form and the sufficiency of affidavits prepared in support of applications for search warrants to search his automobile and his apartment. Corporal Donald W. Miller of the State Police, in support of his application for each warrant, submitted a four-page document. The information upon which Miller was basing probable cause was included in a typewritten statement entitled "Affida-

vit." For want of space, the statement carried over to page 2, labeled "2," which was signed by Corporal Miller. These two pages were affixed in each application to a two-page standard affidavit form commonly used by police departments and accepted by the courts. In the space provided in the form for entry of the grounds for issuance of a warrant, a typewritten statement was inserted which directed the magistrate to "see attached affidavit of Corporal Donald W. Miller made a part of and attached to." Pacheco complains that the affidavits were not legally sufficient in accordance with Rule 41(c) of the Superior Court Rules of Criminal Procedure because the jurat did not appear on the same page as the affiant's statement. However, the same officer who signed the affidavit also signed and swore to the applications for search warrants which in each instance incorporated the affidavit by reference.

 We discuss this issue only to make it clear that this court will not indulge in hypertechnicality on matters so serious as those which are before us today. *See United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965). There is not even the slightest doubt in our minds that page 2 of the affidavit was a continuation of page 1 and that pages 1 and 2 were incorporated in the standard affidavit form by clear and unequivocal reference and by physical attachment.

 Pacheco additionally attacks the substance of the affidavits, contending that on their face they did not make out probable cause sufficient for issuance of the search warrants. The affidavits submitted contained information about the Mills homicide from two separate informants. The first informant was Mills's female companion with whom he had been residing for a brief time. She reported to the police that on the night of the homicide, Mills returned home for a short while and told her he was going out with "Joe." As Mills left their apartment, she looked out and saw him get into a car that she described. The second informant was a co-worker of Gibbons, Pacheco's female companion, who stated that Gibbons reported to work on Monday, April 13, 1981 with tooth marks on her face. Upon questioning Gibbons about the marks, the informant learned that they had been inflicted by Pacheco. Gibbons also told the co-worker that "Joe killed the guy in Tiverton," that he said he was going to kill Mills, and that he later returned home covered with blood. The affidavits indicated that the car Mills's companion described was determined through a police investigation to be owned by Pacheco. The affidavits also recited the discovery of the dead body of Mills. The defendant now asserts that the affidavits did not provide the issuing justice with sufficient information from which the judicial officer could independently conclude that the informants were credible and that their information was reliable. We disagree.

 This court recently considered the issue of an informant's credibility and reliability in *State v. Ricci*, R.I., 472 A.2d 291 (1984). That case was our first opportunity to address this issue in the light of the United States Supreme Court's decision in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates* the Court adopted a "totality of the circumstances" test for a finding of probable cause. That test is characterized by flexibility:

"The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed. *Jones v. United States, supra*, 362 U.S. [257] at 271, 80 S.Ct. [725] at 736 [4 L.Ed.2d 697 (1960)]. We are convinced

that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*." *Id.* at ——, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.

We noted in *State v. Ricci* that we interpret *Gates* as a retraction of the rigid application of the two-pronged test that the Court announced in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and further delineated in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969): "[O]nly the rigid application of the 'two-pronged test' has been abandoned, not the test itself." *State v. Ricci*, 472 A.2d at 296. We further stated:

"[T]his court has adhered to the original meaning of *Aguilar* and *Spinelli* and that our treatment of the issue conforms with what we believe the Court intended in *Gates*. When the Supreme Court reaffirmed the traditional totality-of-the-circumstances approach, it was responding to the rigidity that some states have given the 'two-pronged test.' Ours is not such a state. Rather, we believe the principles that have controlled our determinations remain valid in light of *Gates* and need not change in any way." *Id.* 472 A.2d at 296.

The affidavits in the instant case contain no express assertion of the informants' "track record." But this omission we think does not preclude a finding that they are believable.

■ First-time informants can be found to be believable, and practical common-sense considerations can properly form a determination that probable cause exists. 472 A.2d at 297. The record shows that neither of the informants was anonymous. In addition, each one appears to us to have had sufficient and reliable knowledge of the facts that they reported: Mills's companion's statement was based on first-hand observation; Gibbons's co-worker's statement was based on information given to

her by Gibbons whom the co-worker knew well and with whom defendant was living. Moreover, the credibility of each informant was buttressed by the products of an independent police investigation that corroborated the informants' accounts. On this record, we find the informants to have been credible and their information to have been reliable, and we further conclude that taken as a whole, the affidavits substantially established probable cause for the issuance of the search warrants. *See State v. Ricci*, 472 A.2d at 298. We therefore shall not disturb the finding of the trial justice.

## B. WARRANTLESS ARREST

■ Pacheco sought to exclude his confession on the premise that it was derived from an illegal, warrantless arrest. He claimed that under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the confession was "fruit of the poisonous tree." *Id.* at 485, 83 S.Ct. at 416, 9 L.Ed.2d at 453–54. After a preliminary hearing, the trial justice ruled that defendant's arrest was lawfully executed and therefore that the subsequent confession made by him during his period of detention was competent evidence. The defendant challenges this ruling. We sustain the trial justice.

■ The general rule is that absent entry into a dwelling for the purpose of arresting a criminal suspect, there is no constitutional requirement that police officers first obtain an arrest warrant, provided, however, that the arresting officers have probable cause to believe that the suspect has committed a felony. *United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598, 605 (1976); *In re John C.*, R.I., 425 A.2d 536, 538, *cert. denied*, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981); *see* G.L.1956 (1981 Reenactment) § 12–7–3 and § 12–7–4. Probable cause to arrest depends on whether at the time of arrest the facts and circumstances within the arresting officer's

knowledge and of which he had reasonable, trustworthy information were sufficient to cause a prudent officer to believe that the suspect had committed or was committing a crime. *In re John N.*, R.I., 463 A.2d 174, 178 (1983); *State v. Welch*, R.I., 441 A.2d 539, 541 (1982); *In re John C.*, 425 A.2d at 538. We stated in *In re Armand*, R.I., 454 A.2d 1216 (1983):

> "[A] general principle applicable here is that the mosaic of facts and circumstances must be viewed cumulatively 'as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training.' [Citation omitted.] Moreover, in our review we must examine the completed mosaic in terms of what the police knew, what they heard, and what they observed as trained officers." *Id.* 454 A.2d at 1218.

■ Our function on review is to make an independent examination of the record to determine whether factors existed that established probable cause for an arrest. Unless we perceive them to be clearly erroneous, we do not disturb the findings of the trial justice. *Id.* 454 A.2d at 1218.

The record discloses that Pacheco was stopped and arrested a short distance from his residence as Gibbons and he were driving in defendant's automobile. The record also discloses that the affidavits that supported the search warrants also provided the arresting officers with knowledge of the following facts: a homicide had been committed, statements by two informants were made linking Pacheco with the homicide, a description was made of the automobile in which Mills was last seen alive, and the fact that the described automobile was owned by Pacheco was verified by police. We have held that information upon which probable cause to arrest is premised may be the collective knowledge of the police department and is not restricted to what the arresting officer knows independently. *State v. Belcourt*, R.I., 425 A.2d 1224, 1226–27 (1981). Additionally, the arresting officers in the instant case themselves ob-

served defendant and his female companion place items in the trunk of defendant's car apparently in preparation for flight. All this, we believe, presented a "mosaic of facts and circumstances" sufficient to justify a reasonable belief on the part of a prudent police officer that a homicide had been committed and that the person whom they sought to arrest committed the crime. In respect to the sufficiency of information required to form probable cause, we have stated that establishing probable cause to make an arrest does not require the same degree of proof as is required to prove guilt. *In re Armand*, 454 A.2d at 1218; *State v. Belcourt*, 425 A.2d at 1226. We find that the information known to the officers in the instant case was both trustworthy and reliable as the sources of that information were intimately acquainted with the persons involved in this case, one with the victim, the other with Pacheco. *See State v. Ricci*, 472 A.2d at 297; *State v. Belcourt*, 425 A.2d at 1227; *State v. Soroka*, 112 R.I. 392, 397, 311 A.2d 45, 47 (1973). Because we find no error in the trial justice's ruling, we therefore sustain his findings that (1) the warrantless arrest was valid and (2) defendant's subsequent confession made during the period of detention was not the fruit of an illegal arrest. *See Wong Sun v. United States*, 371 U.S. at 487, 83 S.Ct. at 417, 9 L.Ed.2d at 455. We now consider whether defendant's confession was inadmissible for other reasons.

## C. THE VOLUNTARINESS OF THE CONFESSION

■ Pacheco argues that his taped confession made to police officers was inadmissible because it was induced by promises and therefore was involuntary. Prior to trial he filed a motion to suppress the confession on this ground. In compliance with *Jackson v. Denno*, 378 U.S. 368, 376–77, 84 S.Ct. 1774, 1780–81, 12 L.Ed.2d 908, 915–16 (1964), the trial justice conducted an independent hearing outside the presence of the jury to determine the voluntariness

of Pacheco's confession. He concluded that the confession was voluntary and permitted the prosecution to enter it into evidence. We find no error in the ruling of the trial justice.

Testimony of police officers at the suppression hearing revealed that they provided Pacheco with *Miranda* admonitions at the site of his arrest where no interrogation ensued and again upon arrival at the police station. Officers had asked Pacheco if he wanted assistance of an attorney, and Pacheco explicitly stated that he did not. Pacheco answered questions but did not admit his guilt that evening. Officers further testified that the next morning Pacheco asked to speak with "the bearded detective" (Peter Dias of the Tiverton police department), who went to Pacheco's cell and inquired of Pacheco if he had asked to speak with him. Pacheco responded in the affirmative whereupon the detective immediately began to read Pacheco the *Miranda* warnings. Pacheco interrupted the detective, stating that he knew his rights and that he wanted to talk about the murder. Subsequently, the detective and Pacheco moved to another room, whereupon the detective again advised Pacheco of his rights under *Miranda*. Pacheco clearly indicated that he understood them and that he wanted to discuss the murder. Before giving his statement, Pacheco inquired about his companion, Gibbons. The officers informed him that she was being held and charged with harboring. At this juncture, Pacheco requested that Gibbons not be prosecuted and that he be placed in an out-of-state prison if convicted for the murder. Officers testified that after first consulting with an assistant attorney general, they related to Pacheco that charges against Gibbons would be dismissed, as in fact they subsequently were, and that they would make recommendations that Pacheco serve a prison term at an out-of-state facility. Thereafter, Pacheco gave a statement admitting his participation in the killing of Mills.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that before statements made by an accused at the time of custodial interrogation are admitted in evidence, the prosecution must show that the accused, prior to interrogation, was given what have come to be known as *Miranda* rights and that the accused effected a voluntary, knowing, and intelligent waiver of those rights. *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. The Court has also held that any use in a criminal trial of a defendant's involuntary confession is a denial of due process. *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290, 303 (1978).[3] The burden is on the prosecution to prove by at least a preponderance of the evidence that a defendant's confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627 (1972). In Rhode Island, however, the state must prove voluntariness by clear and convincing evidence. *State v. Rodgers*, R.I., 447 A.2d 730, 731 (1982); *State v. Fuentes*, R.I., 433 A.2d 184, 189 (1981).

We find that the requirements of *Miranda v. Arizona, supra,* were satisfied in this case and that Pacheco made a valid waiver of his constitutional rights. Waiver occurs when an accused intentionally abandons or relinquishes a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938); *State v. Killay*, R.I., 430 A.2d 418, 422 (1981). The record establishes that Pache-

3. In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court held that the defendant's will had been overborne during a persistent four-hour interrogation, even though the defendant was in the hospital in intensive care and unable to speak, so that he had to write his replies. Therefore, the confession could not be used even for impeachment purposes as had been allowed in *Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 646, 28 L.Ed.2d 1, 5 (1971). *Mincey v. Arizona*, 437 U.S. at 397–98, 98 S.Ct. at 2416, 57 L.Ed.2d at 303–04. Thus, the Court drew a distinction between violation of the prophylactic requirements of *Miranda* and involuntariness in the fundamental sense.

co's waiver of his right to remain silent and his right to counsel was knowing, intelligent, and voluntary. Although compliance with the prophylactic requirements of *Miranda* is essential, taken alone it does not eliminate other challenges that may be raised to voluntariness under the totality-of-circumstances test. In this case a challenge has been raised to voluntariness based upon the alleged promises made to Pacheco by the interrogating officers.

The first case in which a confession was rejected as involuntary is the case of *Rex v. Warickshall*, 1 Leach Cr. C 263 (1783). In that case Jane Warickshall had made a full confession of her guilt but challenged the confession on the ground that it had been made "by promises of favour." The Court of King's Bench expressed the rule on admissibility of confessions as follows:

> "Confessions are received in evidence, or rejected as inadmissible, under a consideration whether they are or are not intitled [sic] to credit. A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected." *Id.* at 263–64.

It should be noted that this English rule stemmed from the concept that such confessions were basically unreliable and unworthy of credit. This doctrine concerning admissibility of confessions was separate in origin and separated in time by about a century from the recognition of the privilege against self-incrimination which arose as a result of the abuses of the Court of Star Chamber as in Lilburn's Trial, 3 How. St.Tr. 1315 (1637–1645) and was asserted in the *Twelve Bishop's Trial*, 4 How.St.Tr. 63

(1641). *See* 3 Wigmore *Evidence*, § 818 (McNaughton rev. 1961); 8 Wigmore *Evidence*, § 2250 (McNaughton rev. 1961). These two concepts were often confused and intertwined, and the maxim "Nemo tenetur seipsum accusare" [4] (No one should be held to accuse himself) which underlay the assertion of the privilege against self-incrimination has often been quoted in such confession cases as *Bram v. United States*, 168 U.S. 532, 544, 18 S.Ct. 183, 187, 42 L.Ed. 568, 574 (1897). In *Bram* the rule in respect to confessions was set forth in categorical terms, borrowed from an English text:

> "'But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence * * *.'" *Id.* at 542–43, 18 S.Ct. at 187, 42 L.Ed. at 573 (quoting 3 Russ. *Crimes* 478 (6th ed. 1896)).

However, in *Bram* the issue of admissibility of a confession obtained by a Halifax detective from a mariner who was suspected of killing the ship's captain was based upon a totality of coercive influences. At that time it was not required that any admonitions such as those mandated by *Miranda* be given. Also *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), had not been decided. In that case the *Warickshall* rationale of unworthiness of credit was set to rest, and Justice Frankfurter pointed out that an involuntary confession is inadmissible, not because it is unlikely to be true, but because the methods used offend an underlying principle of our criminal law. That principle in effect is that authorities may not by coercion prove the charge out of the accused's own mouth. *Id.* at 540–41, 81 S.Ct. at 739, 5 L.Ed.2d at 766. This principle tied the rejection of an involuntary confession rather closely to the principle underlying

---

**4.** The maxim is frequently quoted as "Nemo tenetur prodere seipsum" and was early attributed to John Lambert, a Cambridge fellow who was executed for heresy in 1537. Levy, *Origins of the Fifth Amendment* at 3–4 (1968).

the privilege against self-incrimination—that no person should be required to accuse himself.

This trend toward combining the rule of exclusion of coerced confessions with the privilege against self-incrimination was completed and fully rationalized in *Miranda v. Arizona, supra.* For the first time the Court clearly required cautionary admonitions concerning the right to counsel and to remain silent to be given in the police station because it was recognized that at that point the privilege against self-incrimination was endangered and that unless steps were taken to protect the privilege, it would count for naught in the ultimate trial of the case. *Miranda v. Arizona,* 384 U.S. at 444–45, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. The prophylactic requirements of *Miranda* probably rendered the somewhat literal application of the rule enunciated in *Bram* no longer necessary. In fact, a number of courts, both state and federal, have found this to be true. In *United States v. Ferrara,* 377 F.2d 16 (2d Cir.1967), the Court of Appeals for the Second Circuit considered the voluntariness of a confession that was given to a federal agent who stated to the suspect that "if he cooperated with the United States [Attorney] I felt sure that he would get out on reduced bail." *Id.* at 17. This statement was sought to be used by the defendant as a promise that would vitiate the confession under the *Bram* doctrine. In response to this argument, the court observed:

> "The *Bram* opinion cites with approval the statement in an English textbook that a confession is not voluntary if 'obtained by any direct or implied promises, however slight.' That language has never been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendants] will to resist and bring about confessions not freely self-determined * * *.' *Rogers v. Rich-*

*mond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760, [768] (1961)." 377 F.2d at 17.

The Court of Appeals went on to emphasize both that prior to this interview an assistant United States attorney had admonished the defendant concerning his rights to counsel and to remain silent and that he was not subjected to any protracted interrogation or threatened in any way. The court held that the "agent's comment was not the kind of inducement or promise that would, by itself, make the confession involuntary." *Id.* at 18.

In reliance upon this doctrine, the Federal District Court for New Jersey in *United States v. Arcediano,* 371 F.Supp. 457 (D.N.J.1974), found that a defendant who conditioned his offer to give information about a bank robbery upon getting FBI assurance that he would be placed in federal custody, and who was given the assurance that the agent would do his best to bring this about (a promise that was fulfilled), was not wrongfully induced to confess. The judge emphasized that it was the defendant who offered the information, conditioning it upon the assurance that the agents would endeavor to get him placed in federal custody. The court held that such a promise, standing alone, was insufficient to render the confession involuntary. *Id.* at 469.

Similar reasoning has been applied by Courts of Appeal in *United States v. Frazier,* 434 F.2d 994, 995–96 (5th Cir.1970) (the fact of cooperation would be made known to the United States attorney and that some consideration might be given therefor), and in *United States v. Reynolds,* 532 F.2d 1150, 1156 (7th Cir.1976) (agent said there was a possibility that United States attorney and judge would be more lenient in respect to bail and penalty if suspect cooperated). In the latter case the court, applying a totality-of-circumstances test, found that the government had proven by a preponderance of the evidence that the defendant's will was not overborne and that his confession was the

product of a rational intellect. *Id.* at 1159–60.

In *Taylor v. Commonwealth,* 461 S.W.2d 920 (Ky.1970), the court was confronted with a challenge to confessions that were made as part of a "deal" pursuant to which certain charges in Indiana were dismissed as against both defendants. The court emphasized that the circumstances of the promise in that case were entirely "compatible with the exercise by the appellants of a free volition in the giving of the confessions, and therefore the confessions were admissible." *Id.* at 922. The court emphasized that the initial proposal for the "deal" came from one of the defendants, who feared harm at the hands of a former acquaintance if he was sentenced to the Indiana penitentiary. *Id.*

The Supreme Court of Wisconsin in *Pontow v. State,* 58 Wis.2d 135, 205 N.W.2d 775 (1973), a case involving a promise to reduce to a single charge eighteen burglaries to which the defendant ultimately confessed, stated that

> "a promise of leniency does not in itself evince involuntariness, it is a factor which may be considered in making that determination." *Id.* at 143, 205 N.W.2d at 779.

The court went on to hold that this promise, in the circumstances did not render the confession involuntary. *Id.* The principle was reenunciated and followed in *State v. Cydzik,* 60 Wis.2d 683, 692–93, 211 N.W.2d 421, 427 (1973), which again utilized a totality-of-circumstances analysis.

To the same effect are state and federal decisions in *United States v. Glasgow,* 451 F.2d 557, 558 (9th Cir.1971); *United States v. Sibley,* 535 F.Supp. 208, 210–12 (E.D.Pa. 1982); *State v. Anderson,* 298 N.W.2d 63, 65 (Minn.1980); *State v. Edwards,* 49 Ohio St.2d 31, 40–41, 358 N.E.2d 1051, 1058 (1976); *State v. Starling,* 188 N.J.Super. 127, 133, 456 A.2d 125, 129 (1983).

The Supreme Court of Rhode Island in *State v. Nagle,* 25 R.I. 105, 109–10, 54 A. 1063, 1065 (1903), strongly influenced by the reasoning and authority of *Bram v. United States, supra,* enunciated the same categorical rule, derived from an English text, that a confession extracted by any promise direct or implied, however slight, would not be admissible. This rule was repeated with uncritical approval in *State v. Boswell,* 73 R.I. 358, 362, 56 A.2d 196, 198 (1947), although in that case the confession was determined to be voluntary. Most recently in *State v. Amado, supra,* we upheld a ruling by the trial justice that a confession was involuntary when the defendant during an in-custodial interrogation was persuaded to take a polygraph test after being threatened with a capital charge and offered protective custody if he gave a statement. We sustained the holding of the trial justice that the defendant did not waive his constitutional rights "in a manner that squared with *Miranda v. Arizona,*" and that the confession was not given "completely voluntarily, but rather as the result of promises of reward * * *." 424 A.2d at 1060. Our ultimate conclusion was that the trial justice's findings that the defendant "had been subjected to subtle pressures and improper influences," and that these pressures and influences vitiated the voluntariness of the confession were not clearly wrong. *Id.* 424 A.2d at 1063.

Turning to the facts of the case at bar and applying a totality-of-circumstances test rather than the literal rule of *Bram v. United States, supra,* and *State v. Nagle, supra,* our conclusion is that the trial justice did not err in finding the confession voluntary. We are of the opinion that the voluntariness and freedom of will of the defendant was not overborne or diminished by the affirmative reaction of the police to his desire to be placed in an out-of-state prison if convicted or his request that his companion, Gibbons, not be prosecuted for harboring. Such a response under the reasoning of *Warickshall's* case would not deprive the confession of its credibility. Nor does it offend against the values protected by the privilege against self-incrimination as later enunciated by the Supreme Court in *Miranda.* The repeated admoni-

tions of the right to remain silent and the right to counsel, as well as Pacheco's responses to such admonitions and his assertions concerning his understanding thereof to the police, were more than enough to dispel any inferences of the kind of subtle, coercive pressures that the trial court and this court observed in *State v. Amado, supra.*

For the reasons stated, we find that the trial justice was not clearly wrong in ruling that Pacheco's confession was voluntary. Our independent examination of the record leads us to conclude that the confession made by Pacheco was voluntary and therefore was properly admitted into evidence.

### D. THE SEARCH WARRANT FOR BLOOD AND HAIR

█ The defendant raises the issue of the adequacy of the affidavit of Deputy Chief Asa Davol, Jr., for the issuance of a search warrant to take samples of blood and hair from Pacheco. This issue does not require extended analysis since the materials obtained pursuant to this search warrant were suppressed by the trial justice and were not introduced against Pacheco. Therefore, the question of the adequacy of the affidavit is moot.

### E. CROSS–EXAMINATION OF DEFENDANT PACHECO IN RESPECT TO DRUG USE AND ASSAULT AND KIDNAPPING OF WITNESS GIBBONS

█ Pacheco challenges the examination by the prosecution of his use of drugs. In support of this challenge Pacheco cites the general rule enunciated in *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978), that evidence of other criminal activity may not be introduced in a criminal trial unless the evidence is relevant for some purpose other than the purpose of showing that defendant is a person of bad character and criminal propensities. *Id.* at 624, 382 A.2d at 531–32. Pacheco further argues that this general rule in this particular case is not subject to any of the exceptions set

forth in *State v. Colangelo,* 55 R.I. 170, 179 A. 147 (1935). The principles of law enunciated are correct, but the application to this case leaves much to be desired. In this case Pacheco had raised the defense of diminished capacity. In support of this defense he had presented a psychiatrist who detailed his history of drug use from the time he was thirteen years of age. When Pacheco took the stand, his attorney questioned him extensively concerning the subject of his drug use. On cross-examination the prosecutor was permitted by the trial justice to explore this same subject matter, which had become relevant to the question of defendant's ability to form the specific intent necessary to commit the crimes of first- or second-degree murder. Allowing such cross-examination was not an abuse of discretion on the part of the trial justice under the circumstances of this case. *See State v. D'Alo,* R.I., 435 A.2d 317, 320 (1981); *State v. Camerlin,* 117 R.I. 61, 66–67, 362 A.2d 759, 762 (1976).

█ Pacheco also contends that the trial justice committed reversible error in allowing the prosecutor to elicit evidence concerning defendant's assault upon and kidnapping of the witness Gibbons. Initially the relationship between Gibbons and Pacheco was brought out by defense counsel in his cross-examination of Gibbons. During the course of this cross-examination Gibbons testified concerning defendant's having beaten her and threatened to kill her if she testified against him. On redirect examination the prosecutor went into this subject matter in order to rehabilitate Gibbons's credibility. In the course of this rehabilitation reference was made to Gibbons's having lived with Pacheco unwillingly after he kidnapped her from New Hampshire because she feared that he would kill her if she did not conform to his wishes. Since defense counsel opened this line of inquiry, we cannot say it was an abuse of the trial justice's discretion for the court to allow further exploration on redirect examination of the witness Gibbons. *See State v. Mastracchio,* 112 R.I. 487, 495, 312 A.2d

190, 195 (1973). Further, defense counsel again opened this same area of inquiry in his direct examination of defendant. Consequently, allowing the prosecution to cross-examine Pacheco on this same subject could scarcely be considered an abuse of discretion. *See State v. Camerlin, State v. Mastracchio*, both *supra; State v. Bruni*, 79 R.I. 311, 316–17, 88 A.2d 162, 165 (1952).

## F. THE COURT'S INSTRUCTIONS ON DIMINISHED CAPACITY

 Pacheco also challenges the instructions of the trial justice in respect to diminished capacity and asserts that in effect he shifted the burden of proof on this element of the case to defendant in violation of the principles enunciated in *State v. Muir*, R.I., 432 A.2d 1173, 1176 (1981). In support of this argument, Pacheco seeks to dissect portions of the trial justice's instructions in order to suggest that the burden of establishing this fact was placed upon Pacheco. A reading of the entire instruction makes it clear beyond any doubt that the trial justice did not place the burden of proof of this issue upon Pacheco. The court specifically stated:

"However, the Defendant does not have to prove diminished capacity. The burden of proving lack of diminished capacity is on the state."

Nothing could be made more clear by this instruction than the principle that the state had the burden of proving each and every element of the crime of murder, including the lack of diminished capacity to form the necessary specific intent. Consequently, this assertion is without merit.

## III

### CONCLUSION

For the reasons stated, Pacheco's appeal is hereby denied and dismissed. Webster's appeal is sustained in part. The judgment of conviction in regard to Pacheco entered in the Superior Court is hereby affirmed. The papers in the case may be remanded to the Superior Court for a new trial as to Webster.